J-S37029-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| :--- | :--- | :---: |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHNATHAN WINSTON | : | |
| | : | |
| Appellant | : | No. 3416 EDA 2019 |

Appeal from the Judgment of Sentence Entered October 29, 2019
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0000736-2019

BEFORE: SHOGAN, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY NICHOLS, J.:                  Filed: November 19, 2020

Appellant Johnathan Winston appeals from the judgment of sentence following a bench trial and convictions for aggravated assault and possession of an instrument of crime.[1]  Appellant contends the trial court erred by denying his motion to dismiss the charges because the Commonwealth violated his Sixth Amendment right to cross-examine and confront the victim.  We affirm.

We adopt the facts set forth in the trial court's opinion.  *See* Trial Ct. Op., 1/28/20, at 1-2.  We add that on August 5, 2019, as trial began,

---

[1] 18 Pa.C.S. §§ 2702(a)(1), 907(a).

Appellant filed a motion *in limine* seeking to exclude certain evidence.[2] In relevant part to this appeal, Appellant argued as follows:

> [Appellant's counsel]: Your Honor, [Appellant] has a Sixth Amendment Right to cross examine and confront any witnesses -- any and all witnesses accusing him of criminal activity. Our position is that if the Court were allow the Commonwealth to proceed in this scenario . . . where the complaining witness was not called that his Sixth Amendment Rights would be violated.
>
> THE COURT: Okay. Response?
>
> [The Commonwealth]: Your Honor, we have evidence that the crime was committed in the nature of surveillance video, other contemporaneous police officer testimony as to the injuries that the victim suffered, proffered excited utterance testimony which is on a body cam within approximately two minutes of the crime actually being taken place with the complaining witnesses, actual blood -- and it will be very clear from the video. So a substance of the crime that a crime was committed will be in evidence. And then once that body of the crime has been shown the Commonwealth intends to introduce evidence that [Appellant] gave a written statement to this effect. Not just written but also verbal statements soon after this incident. We would contend that non[e] of that -- in fact in every single homicide case that the Commonwealth prosecutes we are without a victim and can prove it through other means, namely in this case the surveillance video which shows the crime and admissions and excited utterances within minutes of the crime itself. For that reason the video will be – there's no basis to suppress the video of the crime, nor any of the statements made by [Appellant]. And just addressing number three of the Motion in Limine written or oral statements allegedly made by the complaining witness. The only statement that the Commonwealth intends to introduce are what we would submit are properly admitted under hearsay exception for excited utterance. The nature of the

---

[2] The motion was not part of the certified record, but the trial transcript reflects that Appellant's counsel handed a copy of the motion to the trial court. N.T. Trial, 8/5/19, at 7.

- 2 -

excited utterance and the basis for it I submit would be apparent upon looking at the body cam footage within two minutes of the crime itself with blood pouring as well as testimony from the officers who heard that statement and the statement itself on the body cam. For those reasons I would ask the [c]ourt to deny the Motion in Limine. And also note that we have recently located -- and there's no mystery in this case. It's clear as day that the victim in this case did not wish to pursue it. But nevertheless the Commonwealth can prove it through much other means. But nevertheless we have recently located the victim in a juvenile -- that is in a juvenile placement in Philadelphia. And so with the Court's permission would even be able to bring in the victim at a different date sometime within a week or two if necessary.

N.T. Trial at 10-11.[3] The trial court stated it would defer ruling on the excited utterance[4] until it heard the testimony and deny the remainder of Appellant's motion *in limine*, which except for the surveillance video, resolved issues that are not on appeal. *Id.* at 11.

Trial began, and Officer Nicholas Epps, the responding officer, testified on direct examination as to what happened when he arrived at the scene within a few minutes of the assault:

---

[3] Although the motion was not part of the certified record, it appears that Appellant also challenged the admission of the surveillance video of the crime. *See* N.T. Trial at 10-11 (quoted above).

[4] Pennsylvania Rule of Evidence 803(2) defines "excited utterance" as "A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused. When the declarant is unidentified, the proponent shall show by independent corroborating evidence that the declarant actually perceived the startling event or condition." Pa.R.E. 803(2).

[The Commonwealth:] How would you describe [the victim's] demeanor and how he was at this particular time?

[Officer Epps:] When I approached [the victim,] he was very worked up, agitated, bleeding from the face.

[The Commonwealth:] And so why don't you tell us what happens and what happens -- so you respond to the scene. Is this your first interaction with this investigation?

[Officer Epps:] Yes. As soon as I seen him bleeding from the face I asked him I said what happened. He said the guy --

[Appellant's trial counsel:] Objection, Your Honor.

[The Commonwealth:] Your Honor, between the last witness and Officer Epps' testimony here for excited utterance purposes --

THE COURT: Yeah, I think this is a classic textbook example of excited utterance.

[The Commonwealth:] Go ahead, Officer Epps. Go ahead and what did you say?

[Officer Epps:] I approached the [victim] and seen that he was bleeding from the face and I had asked him what had happened. And he said that the guy cut his face and shit.

[The Commonwealth:] Did he know who or anything?

[Officer Epps:] No, I didn't ask him -- I said did you see the male and he said no I did not see him.

*Id.* at 28-29; *see also id.* at 20 (stating that police arrived within a few minutes of the actual assault), 26.[5]   Neither the victim nor Appellant testified.[6]

The trial court found Appellant guilty and ordered a presentence investigation.  *Id.* at 84-85.  On October 29, 2019, the trial court sentenced Appellant to ten to twenty years' imprisonment, and Appellant did not file a post-sentence motion.  Appellant timely appealed and filed a court-ordered Pa.R.A.P. 1925(b) statement.

Appellant raises one issue:

_____

[5] The parties do not dispute that the trial court intended to overrule Appellant's objection.  We add that Appellant did not renew his objection but that Appellant noted he filed a motion *in limine* when he rested his case.

[6] We add that Officers Epps and Kevin Lamberto each testified that a female witness (who was not identified at trial and did not testify) identified Appellant as the attacker.  N.T. Trial at 33, 42.  Both officers identified Appellant in-court as the person the woman identified. *Id.* Officer Lamberto also identified Appellant from the surveillance video. *Id.* at 46.  Officer Francis Devine additionally testified that at the train station, the victim identified Appellant as the attacker. *Id.* at 49.  We add that at trial, the Commonwealth introduced Appellant's signed, written waiver of his *Miranda* rights and signed inculpatory statement, in which Appellant indicated:

> I was getting on the train and another guy on the train said my lips and color of them were messed up.  He made fun of me so I pulled out a razor and I cut him on the side of his face and he ran.  And I punched him one time and I walked up the steps in the terminal.

*Id.* at 66, 75.

The trial court was in error in denying [Appellant's] motion *in limine* requesting a dismissal of all charges in that the Commonwealth was proceeding to trial without the victim which deprived [Appellant] of his Sixth Amendment right to cross-examine and confront the individual accusing him of criminal activity.

Appellant's Brief at 4.

In support of his sole issue, Appellant discusses the Confrontation Clause and the legal test for determining whether a statement is nontestimonial. *Id.* at 7-9. Appellant summarizes the applicable law, and we quote Appellant's argument in its entirety:

On the day of the trial, the Commonwealth indicated to the court that they had located the juvenile [victim] in placement in the City of Philadelphia. They also indicated that if necessary they could have him available. The court allowed evidence in the absence of the victim including a body cam video which was marked as Exhibit C-1 during the course of trial. They also allowed a SEPTA surveillance video to [be] shown which was marked as Exhibit C-4 during the course of trial.

It is respectfully argued that the Motion in *Limine* made by [Appellant's trial] counsel requesting that all charges be dismissed should have been granted and allowing trial to proceed without the victim and allowing introduction of the evidence as stated above was in violation of [Appellant's] Sixth Amendment constitutional rights.

*Id.* at 9-10 (citations omitted and formatting altered).

The standard of review follows:

[W]hether a defendant has been denied his right to confront a witness under the Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the States *via* the Fourteenth Amendment, is a question of law, for which our standard of review is *de novo* and our scope of review is plenary.

*Commonwealth v. Rivera*, --- A.3d ---, ---, 2020 WL 4999691, at *4 (Pa. Super. 2020) (citation omitted).

> The Sixth Amendment to the United States Constitution provides a criminal defendant with the right "to be confronted with the witnesses against him." U.S. Const. Amend. VI. Specifically, the Supreme Court of the United States held that the Confrontation Clause protects a criminal defendant's right to confront witnesses bearing testimony against him or her.

*Commonwealth v. Hajdarevic*, 236 A.3d 87, 90 (Pa. Super. 2020) (citation omitted).

In *Commonwealth v. Williams*, 103 A.3d 354 (Pa. Super. 2014), this Court explained that "the protection of the Confrontation Clause attaches only to testimonial hearsay." *Williams*, 103 A.3d at 359; *see generally Crawford v. Washington*, 541 U.S. 36 (2004). The *Williams* Court summarized cases from the United States Supreme Court distinguishing testimonial hearsay from nontestimonial hearsay:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 359 (summarizing *Davis v. Washington*, 547 U.S. 813 (2006)).

According to the *Williams* Court, *Davis* "involved admission of a victim's statement to a 911 operator." *Williams*, 103 A.3d at 359 (citation omitted).

When the victim [in *Davis*] told the operator her assailant ran out the door, the operator instructed the victim to stay on the line and answer questions. Thereafter, the operator gathered more information about the perpetrator and the circumstances of the assault. Within four minutes of the 911 call, police arrived to find the victim "shaken" and "frantic." The trial court admitted a recording of the 911 call into evidence over the defendant's Confrontation Clause objection.

*Id.* (citations omitted).

The *Davis* Court framed the question before it as follows:

The question before us then, is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements.

In answering that question, the Court noted the victim was describing events as they were happening, rather than rendering an account of past events. The 911 call was plainly a call for help against a bona fide physical threat. The operator's follow up questions were necessary to be able to resolve the present emergency, rather than simply to learn . . . what happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. Likewise, the informality of the 911 call—the victim provided frantic answers via telephone from a potentially unsafe environment—evinced the nontestimonial nature of the victim's statements.

*Id.* at 359-60 (citations omitted and formatting altered).

The *Williams* Court also summarized *Michigan v. Bryant*, 562 U.S. 344 (2011):

in *Bryant*, police found the victim dying of a gunshot wound. They asked him what had happened, who had shot him, and where the shooting had occurred. The victim identified the defendant by first name and explained that the defendant shot him through the back door of the defendant's house. The victim died within several hours of his conversation with police. The *Bryant* Court summarized the issue as follows:

- 8 -

> We now face a new context: a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim. Thus, we confront for the first time circumstances in which the ongoing emergency discussed in *Davis* extends beyond an individual victim to a potential threat to the responding police and the public at large.

The Court also explained the objective nature of the primary purpose inquiry: the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred. The existence of an ongoing emergency is important because it indicates that the declarant's purpose in speaking was to help resolve a dangerous situation rather than prove past events. The zone of potential victims and the type of weapon involved inform the inquiry. . . .

In a passage highly relevant to the matter on appeal, the *Bryant* Court discussed the relevance of the victim's medical condition.

> The medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one. The victim's medical state also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public.

Finally, the *Bryant* Court explained that the statements of both parties are relevant to determining a conversation's primary purpose. The Court recognized that police serve as first responders and as investigators and therefore can have mixed motives. Likewise, an injured victim could have mixed motives in making a statement to a police officer. The nature and severity of the victim's injuries are relevant to the victim's purpose in making his or her statements. In summary, the

existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.

*Williams*, 103 A.3d at 360-61 (citations omitted and formatting altered).

The *Bryant* Court held that the facts established

an ongoing emergency because an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded the victim within a few blocks and a few minutes of the location where the police found him.  The victim made the statements introduced at trial within minutes of his encounter with police and before they had secured the scene.  The victim was in pain and repeatedly asked when paramedics would arrive.  The Court therefore did not believe the victim had a primary purpose of establishing events relevant to a criminal prosecution.  The questions from the police officers simply allowed them to assess the situation, the threat to their own safety, and possible danger to the potential victim and to the public.  The encounter between the victim and the police lacked formality, and was similar, though not identical, to the informal, harried 911 call in *Davis* . . . .  The Court therefore concluded the victim's statements were nontestimonial and their admission at the defendant's trial did not violate his Confrontation Clause rights.

*Id.* at 361 (citations omitted and formatting altered).

To the extent Appellant apparently challenges the admission of the videos, this Court addressed a similar issue in *Commonwealth v. McKellick*, 24 A.3d 982 (Pa. Super. 2011).[7]  In *McKellick*, the Court resolved the admissibility of a silent videotape of the defendant performing field sobriety tests unsuccessfully.  *McKellick*, 24 A.3d at 985.  The

---

[7] As noted above, Appellant contends that introduction of the body cam video and the surveillance video in lieu of the victim's testimony violated his Sixth Amendment rights.  *See* Appellant's Brief at 9-10.

defendant contended, among other things, that his right of confrontation was violated when the Commonwealth introduced the videotape without permitting him to confront the arresting officer, who had passed away prior to the defendant's trial. *Id.* at 985-86.

In resolving the issue, the ***McKellick*** Court observed that a "visual recording of a suspect's legally compelled actions, though perhaps highly incriminating, would not, in general, constitute communicative or testimonial evidence." *Id.* at 987 (citation omitted); ***see also Commonwealth v. Rishel***, 582 A.2d 662, 664 (Pa. Super. 1990) (summarizing procedural posture of ***Pennsylvania v. Muniz***, 496 U.S. 582 (1990), in which an appellate court noted that "field sobriety tests in front of the video camera [generally elicits] physical and not testimonial evidence").

Instantly, and as set forth previously, the police arrived within a few minutes of the assault. *See* N.T. Trial at 20; ***accord*** Trial Ct. Op. at 1. Upon arriving at the scene, the police asked the victim, who was bleeding from the face, "what had happened," and the victim responded that "the guy cut his face." *See* N.T. Trial at 28-29. The police asked the victim if he saw "the male and [the victim] said no I did not see him." *Id.* at 29.

Similar to the ***Bryant*** Court, we agree with the trial court that the above facts established an ongoing emergency in which the police's inquiry "allowed them to assess the situation, the threat to their own safety, and possible danger . . . to the public." ***See Williams***, 103 A.3d at 361

(summarizing *Bryant*). To paraphrase the *Williams* Court, the "encounter between the victim and the police lacked formality" and was similar to the police inquiry in *Bryant* and the 911 call in *Davis*. *See id.* at 359-61. We therefore agree with the trial court that the instant "victim's statements were nontestimonial and their admission at [Appellant's] trial did not violate his Confrontation Clause rights." *See id.* at 361.

Finally, as noted above, Appellant argues that the trial court erred by denying his motion *in limine* and "allowing trial to proceed without the victim and allowing introduction of the" body cam and surveillance video. Appellant's Brief at 9-10.[8] Appellant, however, did not explain how the videos at issue constitute testimonial hearsay, which is subject to the Sixth Amendment right of confrontation. *Cf. McKellick*, 24 A.3d at 987; *cf. also Rishel*, 582 A.2d at 664. Regardless, we agree with the trial court's reasoning that the body cam video at issue depicted the victim in a state of distress and was a nontestimonial "excited utterance." *See* Trial Ct. Op. at 5-6; *see generally Commonwealth v. Manley*, 985 A.2d 256, 266 (Pa. Super. 2009). We also agree with the trial court's reasoning that the SEPTA surveillance video was also nontestimonial in nature. *See* Trial Ct. Op. at 6-

---

[8] As we noted above, the motion *in limine* was not part of the certified record and apparently challenged the admission of the surveillance video only. N.T. Trial at 10-11. Out of an abundance of caution, we address Appellant's challenge to the admission of the body cam video, as well.

7. We observe that if a silent videotape of a defendant's "legally compelled actions," *e.g.*, field sobriety tests, does not violate a defendant's right of confrontation, then it would appear to follow that a surveillance videotape involving no legally compelled actions whatsoever would also be nontestimonial in nature. *Cf. McKellick*, 24 A.3d at 987. For these reasons, Appellant's claim that his Sixth Amendment right to confront his accuser was not violated. *See Rivera*, --- A.3d at ---, 2020 WL 4999691, at *4.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/19/20

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CRIMINAL DIVISION**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | **CP-23-CR-736-2019** |
| | : | |
| **vs.** | : | **3416 EDA 2019** |
| | : | |
| **JONATHAN WINSTON** | : | |
| | : | |

**A. Sheldon Kovach, Esquire, on behalf of the Commonwealth
Scott D. Galloway, Esquire, on behalf of the Defendant**

# O P I N I O N

**Bradley, J.**                         **FILED:**      1/28/20

At the conclusion of a non-jury trial the Defendant, Jonathon Winston, was found guilty of aggravated assault[1], a first-degree felony and possessing an instrument of crime[2], a first-degree misdemeanor. He was sentenced on October 29, 2019 to an aggregate term of imprisonment of ten to twenty years. Briefly, the incident that gave rise to Defendant's conviction occurred on Saturday, October 6, 209 at about 12:30 p.m. Defendant assaulted the victim on a SEPTA train in Upper Darby at the 69th Street Terminal, slashing him with a broken razor. Defendant "sliced" the victim's face from his hairline to his jaw and inflicted multiple additional lacerations. The victim bled profusely and was in a highly agitated state when responders came to his aid within three minutes of the assault. The assault was

---

[1] 18 Pa.C.S.A. §2702(a)(1)
[2] 18 Pa.C.S.A. §907(a)

1

captured in a SEPTA surveillance video, Exhibit C-4. Body cam video captured by a responding officer showed the victim's extensive injuries. After his arrest the Defendant waived his *Miranda* rights at the Upper Darby Police station. In a post-waiver interview he stated that as he was getting on the train another man made fun of him so he "pulled a razor and cut him on the side of the face." Exhibit C-12. A razor was recovered from the SEPTA car where the attack took place. The razor did not appear in the SEPTA video until after the attack and after Defendant exited the train. The Defendant had walked past the area where the razor was recovered.

On November 27, 2019 Defendant filed a timely Notice of Appeal. In response to the Trial Court's Order directing him to file a Concise Statement of Errors Complained of on Appeal Defendant has identified a single issue:

> Was the Trial Court in error in denying Defendant's Motion in Limine requesting a dismissal of all charges in that the Commonwealth was proceeding to Trial without the victim deprived(sic) the Defendant of his Sixth Amendment right to cross-examine and confront the individual accusing him of criminal activity?

Rule 1925(b) Statement.

"The Sixth Amendment to the United States Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' U.S. Const., amend. VI. This constitutional protection is known as the Confrontation Clause." Commonwealth v. Allshouse, 985 A.2d 847, 852 (Pa. 2009). "The Confrontation Clause prohibits out-of-court testimonial statements by a witness, regardless of whether the statements are deemed reliable by the trial court, unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to

2

cross-examine the witness." Id. *citing* Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, "where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." Id. at 853 *quoting* Crawford v. Washington, 541 U.S. 68, 124 S.Ct. 1354.

In determining whether a statement is nontestimonial the courts have conducted what has come to be called a "primary purpose inquiry." Id. at 854 *citing* Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). If a declarant makes a statement and it is made with the purpose of enabling police to meet an ongoing emergency it is nontestimonial. "Conversely, a statement is testimonial... if: (1) it was made in absence of an ongoing emergency; *and* (2) the primary objective of the interrogation or questioning that resulted in the statement was to establish or prove past events." Id. (emphasis added). In Allhouse, supra, the Supreme Court found that statements made by a child witness to a CYS worker seven days after the child's brother suffered a spiral fracture to his humerus were made during the course of an ongoing emergency. The children were removed from the appellant's home and placed with their grandparents after the victim's injury was discovered. The appellant suggested to the CYS worker that a grandparent may have injured the victim. The child witness was in the custody of her grandparents and in response to thae appellant's accusation the CYS worker went to their home to check on the child's well-being. During this visit the child reported that the appellant caused the victim's injury.

3

On the day of trial the victim in this case was in juvenile placement in Philadelphia. Before trial he informed the prosecution that he was not willing to cooperate with the Commonwealth in its pursuit of a conviction against the Defendant. Nevertheless, the Commonwealth moved forward and presented evidence that rendered the victim's testimony unnecessary. See N.T. 8/5/20 p. 11.

Exhibit C-1 was introduced through the testimony of SEPTA Police Patrol Officer Nicholas Epps. N.T. 8/5/19 p. 25. Officer Epps was wearing a bodycam when he was called to respond to "an assault on the outbound train." Id. at 26. He immediately turned his camera on at 12:31 p.m. and within eight seconds he was with the victim, who appears on the video, Exhibit C-1. The victim is bleeding from the face and "agitated." This description, offered by Officer Epps in his testimony, does not convey the level of terror that the victim was exhibiting. Officer Epps responds to the call and asks the victim what happened and he screams, "the guy cut my face and shit." He is hysterical and relates that he did not know the man and that his assailant was "fucking crazy." Exhibit C-2 depicts the victim's injuries in photographic form and demonstrates that his level of panic was understandable given the severity of the injuries and the fact that, as demonstrated by Exhibit C-4 the SEPTA surveillance video, the attack occurred only two to three minutes earlier. See N.T. 8/5/19 p. 45 (showing the assault occurring at 12:28:35 p.m.) Following his interaction with the victim, at the direction of an Upper Darby police officer, Officer Epps continued on to search for more victims on the platform. Id. at 33.

4

This evidence did not infringe on Defendant's right to confront witnesses against him because, without question, it is nontestimonial and falls into the "excited utterance" exception to the rule against Hearsay.[3] See Pa.R.E. 803(2).

> [A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.... Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event. The circumstances surrounding the statements may be sufficient to establish the existence of a sufficiently startling event.

Commonwealth v. Colon, 102 A.3d 1033, 1037–38 (Pa. Super. 2014) *quoting* Commonwealth v. Murray, 83 A.3d 137, 157–158 (Pa. 2013) (citations omitted). The fact that Officer Epps approached and asked the victim "what happened?" does not warrant a different conclusion. See Colon, supra, (officer encountered recently assaulted victim and asked, "what happened?" Her immediate response was an excited utterance.)

---

[3] "'Hearsay' is defined as a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. Rules of Evid., Rule 801(c), 42 Pa.C.S.A." Commonwealth v. Gray, 867 A.2d 560 (Pa. Super. 2005).

5

The victim's statements were made within three minutes of a vicious assault that left him severely injured and bleeding profusely. They were given under what must be considered "informal" circumstances: on the SEPTA platform. The victim was borderline hysterical when Officer Epps came to his aid. Following his interaction with the victim Officer Epps continued to search for additional victims. An immediate and ongoing emergency existed and the victim's nontestimonial statements were made during the course of that emergency.[4]

The SEPTA surveillance video that was viewed without audio at trial was also nontestimonial. In Commonwealth v. McKellick, 24 A.3d 982 (Pa. Super. 2011) it was the appellant's contention that his right to confront his "accuser" was violated when video from a dashboard-mounted camera that depicted the appellant's failed attempts at field sobriety tests was entered into evidence. The officer who conducted the motor vehicle stop and the subsequent investigation died before trial. The appellant claimed that the introduction of the video evidence without the deceased officer's testimony violated his Sixth Amendment and Article I, §9 constitutional rights to confront witnesses against him. The Superior Court found that the trial court did not abuse its

---

[4] Assuming *arguendo* that the Trial Court erred by allowing the audio that included the Victim's statements into evidence, that error was harmless. The remaining evidence was overwhelming. In the course of being "processed" at the Upper Darby Police Station Defendant told Officer Francis Devine that he had used a razor to cut someone. N.T. 8/5/19 p. 51. When, incident to arrest his blood soaked clothes were seized, the Defendant thanked Officer Devine: "[b]ecause when he had cut the guy the guy was bleeding a lot and it grossed him out." Id. A razor that was recovered from the L train in the vicinity of the attack was introduced into evidence. Id. at 56-60. After being *Mirandized*, in a written statement Defendant admitted pulling a razor and cutting a guy who made fun of him. See id. at 65-75. The SEPTA video, Exhibit C-4, captured the Defendant on the train as he committed the assault and as he left the train: "[T]he properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." Commonwealth v. Stallworth, 368, 781 A.2d 110, 120 (Pa. 2001).

6

discretion by admitting the video. The video evidence did not infringe on the

defendant's right to confront witnesses against him because it was not testimonial.

Quoting Commonwealth v. Mollett, 5 A.3d 291, 307 (Pa.Super. 2010), the Court

explained:

> Whether a defendant has been denied his right to confront a witness is a
> question of law for which our standard of review is *de novo* and our scope
> of review is plenary. Commonwealth v. Atkinson, 987 A.2d 743
> (Pa.Super.2009). In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354,
> 158 L.Ed.2d 177 (2004), the Supreme Court held that the right of
> confrontation, when the government attempts to introduce **testimonial
> hearsay**, requires that the witness who made the statement be
> unavailable for trial and that the defendant had a prior opportunity to
> cross-examine that witness. Crawford, supra.

24 A.3d at 986 (emphasis in original). The evidence in *McKellick*, which did not include

audio, was demonstrative[5], not testimonial. It was properly authenticated through the

testimony of the Pennsylvania State Police mobile video recording officer who was

responsible for downloading videos from the video recording equipment in police

vehicles onto disks upon a trooper's request and who explained the system generally

and identified the video specifically. That officer's testimony sufficiently authenticated

the evidence. It demonstrated that the video was a "fair and accurate representation of

what it is purported to depict." Id. Therefore, the demonstrative evidence was properly

admitted. To the extent that the testifying trooper described the events that were

---

[5] Demonstrative evidence is evidence which is "tendered for the purpose of rendering other evidence more comprehensible to the trier of fact." Demonstrative evidence such as photographs, motion pictures, diagrams, and models have long been permitted to be entered into evidence provided that the demonstrative evidence fairly and accurately represents that which it purports to depict. See Commonwealth v. McKellick, 24 A.3d 986-87.

7

included in the video, the Superior Court found that the trial court, as the finder of fact, was free to believe or disbelieve the witness's depiction of events recorded therein and to determine whether the videotape accurately and fairly represented the appellant's actions during the stop. Thus, the evidence was not testimonial and the appellant's right to confront witnesses against him was not infringed on due to the arresting officers absence at trial.

Similarly, in this case the SEPTA video did not include audio. It was authenticated by stipulation.[6] To the extent that any witnesses viewing the video characterized the events depicted therein, the Trial Court sitting as fact finder was free to draw its own conclusions be they similar to or at variance with the testimony that accompanied the presentation of the video. Because the evidence is demonstrative, not testimonial, Defendant's claim has no merit.

In light of the foregoing it is respectfully submitted that judgment of sentence should be affirmed.

BY THE COURT:

James P. Bradley,                                    J.

---

[6] Exhibit C-4 was identified as the "surveillance video from SEPTA." N.T. 8/5/19 p. 44. The evidence was stipulated to. The notes of testimony erroneously state that the "incident" was stipulated to rather than the "evidence."

8